UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH HAMILTON,

       Plaintiff,

v.                            Case No. 24-10709

HIRERIGHT HOLDINGS CORP.     Sean F. Cox
d/b/a HIRERIGHT LLC,         United States District Court Judge

       Defendant.
_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION TO DISMISS**

Plaintiff is a man with a mild form of cerebal palsy, who was employed as a school bus driver for a number of years, until his employer began using Defendant's employee screening services. In this diversity action, Plaintiff asserts claims against Defendant under Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"). The matter is before the Court on Defendant's Motion to Dismiss, brought pursuant to Fed. R. Civ. P. 12(b)(6). The parties have briefed the issues and the Court concludes that oral argument is not necessary. Local Rule 7.1. For the reasons set forth below, the Court DENIES the motion and shall allow Plaintiff's claims against Defendant to proceed.

**BACKGROUND**

**A.**    **Procedural Background**

On August 23, 2023, Plaintiff Joseph Hamilton ("Plaintiff") filed Case Number 23-12162 against the following three Defendants: 1) Durham School Services, LP ("Durham"); 2) National Express, LLC ("National Express"); and 3) HireRight Holdings Corporation d/b/a HireRight,

1

LLC ("HireRight").  The action was filed in federal court based upon federal-question jurisdiction over Plaintiff's claims under the federal ADA.   Plaintiff's First Amended Complaint asserted six counts.  But only Counts 3 and 4 (state-law claims under Michigan's PWDCRA) were asserted against Defendant HireRight.

Defendant HireRight filed a Motion to Dismiss Plaintiff's First Amended Complaint, asserting that it is not a proper defendant under Michigan's PWDCRA.  Those were the only claims asserted against Defendant HireRight in that case.   Because the question of whether Plaintiff can assert a PWDCRA claim against Defendant HireRight under the facts at issue presents a novel issue of state law that has not been squarely addressed by Michigan courts, this Court declined to exercise supplemental jurisdiction over the state-law claims asserted against HireRight and dismissed them without prejudice.

Thereafter, Plaintiff filed suit against Defendant HireRight in state court, and HireRight removed the action to this Court, based upon diversity jurisdiction.  This second action, Case Number 24-10709 was reassigned to this Court as a companion case to Case Number 23-12162.

Plaintiff's Complaint in this action asserts the following two counts: 1) "Discriminatory Medical Examination In Violation Of The Persons With Disabilities Civil Rights Act, M.C.L. § 37.1101 Et Seq." (Count 1); and 2) "Disparate Treatment In Violation Of Michigan's Persons With Disabilities Civil Rights Act" (Count 2).

On March 26, 2024, Defendant HireRight filed the instant Motion to Dismiss.

**B.**    **Standard Of Decision**

Defendant HireRight's Motion to Dismiss is brought under Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss" under Fed. R. Civ. P. 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto.  *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

**C.    Relevant Allegations In Plaintiff's Complaint**

Plaintiff is a 65-year old man who has a "mild form of cerebral palsy ('CP') that manifests itself as slight deformities on his left hand and left foot – both are slightly smaller and less agile than this right hand and right foot but otherwise of adequate strength for an adult male."  (Compl. at ¶¶ 8-9).

Plaintiff was employed to drive school buses for the Ann Arbor Public Schools from 2013 until 2021.  (*Id*. at ¶ 11).   During the relevant time period, Plaintiff was employed by Durham, an entity that was engaged to provide transportation services for the Ann Arbor Public Schools.  (*Id*. at ¶ 13 & 14).

At all times between 2013 and 2021, Plaintiff complied with the Department of Transportation's ("DOT") requirements for maintaining the Commercial Driver's License ("CDL") necessary to operate a school bus.  (*Id*. at ¶ 15).  As part of the DOT's requirements for a CDL, Plaintiff underwent biannual medical certifications.  (Compl. at ¶ 16).

In 2015, when Durham took on Plaintiff as an employee, it had a third-party employment screening agency, "TalentWise," screen Plaintiff, and he passed that screening.  (*Id*. at ¶ 17). Between 2015 and 2020, Durham "conducted periodic driver evaluations, and these always

resulted in positive conclusions" for Plaintiff.  (Compl. at ¶ 18).

Between 2015 and 2021, Plaintiff prepared several medical forms for each of his biannual CDL renewals and these forms ask the applicant to indicate whether they have had any of a list of 32 injuries, disabilities, or impairments, including "19. Missing or limited use of arm, hand, finger, leg, foot, toe."  (Compl. at ¶ 19).  That form "also asks the applicant to provide further comment on any of these 32 items for which they provided a 'yes answer."  (*Id*. at ¶ 20).  Plaintiff "provided further explanation regarding his mild form of CP."  (*Id*. at ¶ 21).  Plaintiff would then report to a medical clinic selected by Durham for a physical examination.  (*Id*. at ¶ 22).

"The regular process for these biannual medical examinations is for the physician to review the medical form completed by the driver, conduct a physical examination, and then complete and sign the medical form and provided a medical certification for the driver to submit to his employer."  (Compl. at ¶ 23). "The medical form includes a place for the physician to indicate whether the CDL applicant could be approved based on that examination alone, or whether the applicant required a Skills Performance Evaluation (SPE) Certificate from the DOT to be certified."  (*Id*. at ¶ 24)

"An SPE Certificate 'allows drivers with missing or impaired limbs to drive CMVs across state lines if they have been fitted with (and are wearing) the right prosthetic device, and the driver can demonstrate the ability to drive the truck safely by completing on-and off-road activities. If the driver passes the driving test, he or she will receive a SPE certificate. Over the years, FMCSA has granted more than 3,000 SPE certificates to truck drivers who have shown that  they can drive safely on the nation's highways.'" (Compl. at ¶ 25)

"Under the Department of Transportation Regulations governing commercial drivers, a driver is physically qualified to drive a commercial motor vehicle [i]f that person, inter alia, (1) has no loss of a foot, a leg, a hand, or an arm, or has been granted a skill performance evaluation certificate pursuant to § 391.49; (2) Has no impairment of: (i) A hand or finger which interferes with prehension or power grasping; or (ii) An arm, foot, or leg which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or any other significant limb defect or limitation which interferes with the ability to perform normal tasks associated with operating a commercial motor vehicle; or has been granted a skill performance evaluation certificate pursuant to § 391.49. 49 C.F.R. § 391.41(b)(1)-(2) (emphasis added)."  (Compl. at ¶ 27).

Plaintiff "is not fitted with a prosthetic device, is not missing any limbs, and has never experienced any impairment that would prevent him from operating a motor vehicle" and he "has no condition that interferes with his prehension or grasping, nor with any task associated with operating a motor vehicle."  (Compl. at ¶ 26 & 28).

Plaintiff "provided signed medical forms for his CDL renewal in 2015, 2017, 2019, and February of 2021."  (Compl. at ¶ 29)  "On each of these forms, he checked of[f] 'yes' for the box 'Missing or limited use of arm, hand, finger, leg, foot, toe' and then provided the additional comment that he had CP-related mild deformity to his left hand and foot, but that he had sufficient strength for wheel and pedal controls."  (*Id*. at ¶ 30).

"On each of these Medical Forms and the Certificates between 2015 and 2021 issued by the examining physician from the clinic selected by Durham [ ], the physicians acknowledged [Plaintiff]'s left hand and foot conditions but always checked the box that he

5

was cleared to operate." (Compl. at ¶ 32). "None of these physicians ever checked the box that [Plaintiff] required an SPE or otherwise indicated" that he "had any impairment interfering with any task required to operate a motor vehicle." (*Id*. at ¶ 33).

On February 2, 2021, Plaintiff "completed the same process he had completed on all prior occasions between 2015 and 2021: he appeared for his mandatory biannual physical at the clinic selected by Durham [ ] for his examination—and submitted to a full physical exam by Dr. Joseph Valle." (Compl. at ¶ 34). "Dr. Valle reviewed the DOT Medical Form [Plaintiff] had completed, indicated that [he] met the physical standards of 49 CFR 391.41 to qualify for a 2-year certificate, and signed the medical form." (*Id*. at ¶ 35). "Dr. Valle then issued [Plaintiff] a Medical Examiner's Certificate indicating only that [he] must wear corrective lenses, and certified [him] through February 2, 2023." (*Id*. at ¶ 36) "On this February 2, 2023, report, Dr. Valle noted [Plaintiff's] 'flexion contracture of LIF and left foot' but nonetheless cleared him as 'meets the standards in 49 CFR 391.41' and qualified him for a 2-year certification." (*Id*. at ¶ 37). Although the "report allows the doctor to indicate that the driver with any limitation could be qualified for a shorter period of time or defer the driver's qualification pending some condition," "Dr. Valle elected and signed off on a full and unconditional qualification" of Plaintiff. (*Id*. at ¶ 38). "That same day," Plaintiff submitted the signed medical form and medical certificate to Durham. (*Id*. at ¶ 39).

"In 2015, 2017, and 2019, when [Plaintiff] submitted his prior Medical Form and Medical Examiner's Certificate" to Durham, "it accepted the form, his CDL remained active, and he continued as a bus driver for Durham [ ] without interruption." (Compl. at ¶ 40).

That changed, however, after Durham began using Defendant HireRight to provide

"Durham with employee screening services, including the review of DOT medical forms and certifications."  (Compl. at ¶ 41).   Plaintiff alleges that "HireRight reviews these medical documents and *instructs Durham*" as to "whether an individual driver must undergo further medical evaluation before approving them to operate a school bus."  (*Id*. at ¶ 42) (emphasis added).

Plaintiff alleges that "[i]n early February 2021, HireRight immediately flagged" him to Durham "as medically disqualified due to the statement on these medical forms that he had cerebral palsy" and "HireRight *instructed Durham*" "to require [Plaintiff] to undergo an SPE because his medical form said 'cerebral palsy' on it."  (Compl. at ¶ 43 & 44) (emphasis added).

Plaintiff alleges that Hireright "made this determination without:" "conducting its own examination of" Plaintiff, "without speaking to Dr. Valle who examined" Plaintiff, and "without reviewing any other medical records for" Plaintiff.  (Compl. at ¶ 45-47).  "Rather, HireRight saw the term 'cerebral palsy' on the Medical Examination Form and Certificate and made the uninformed assumption, based on stereotypes rather than any individualized assessment of [Plaintiff], that he would not and could not be qualified to operate a bus because he had CP." (*Id*. at ¶ 48)

In February of 2021, Durham "relying on HireRight's determination that Mr. Hamilton was medically disqualified, officially rejected [Plaintiff's] Medical Form and Medical Examiner's Certificate and began to treat him with disdain, humiliate him, and bar him from driving a school bus because they suddenly saw him as a person with a disability even though he has no impairment and was fully qualified and medically certified to drive a school bus.  (Compl. at ¶ 50).

"[S]olely because of HireRight's uninformed, stereotyped assumptions about [Plaintiff's] mild cerebral palsy, which has never impaired him and was never flagged by his examining physicians as an impairment to safely operating a bus, Durham" refused to allow" Plaintiff to operate a school bus.  (Compl. at ¶ 52).

On February 3, 2021, the day after Plaintiff submitted his paperwork, "Cheri Henrion, the Safety Supervisor for Durham," contacted Plaintiff "to inform him that *HireRight insisted to Durham*" that "he get an SPE in order to continue working as a bus driver because he had cerebral palsy."  (Compl. at ¶ 53) (emphasis added).

Plaintiff then tried to get an SPE.  After receiving the SPE packet, Plaintiff was examined by Dr. Donald E. Wild, who indicated on a medical form for Plaintiff that he has no problem driving a motor vehicle and that he has effectively driven a school bus in the past.  (Compl. at ¶ 55-57).  After Plaintiff sent in his SPE packet in, the DOT advised Plaintiff "that it cannot conduct an SPE unless the examining physician indicates that an SPE is necessary," and Dr. Wild "had not checked that box."  (*Id*. at ¶ 59-61).

Plaintiff relayed that information to Durham.  (Compl. at ¶ 62).  Durham's "local supervisor Ed Gallagher" and "its National Safety Director Ron Limbach" then spoke with Plaintiff "by phone and said that HireRight's 'medical review' of his file led to the determination that the SPE was required."  (*Id*. at ¶ 63).

Plaintiff alleges that Durham imposed on him "unnecessary conditions of employment because of HireRight's uninformed directive that he had a disability."  (Compl. at ¶ 67).

"On March 24, 2021, the first day back at school after the pandemic shutdown, Gallagher intercepted [Plaintiff] at the front door and informed him that he was not cleared to

8

drive." (Compl. at ¶ 68). Gallagher further informed Plaintiff that Durham "was waiting for a response from the DOT, and that until this was resolved, he would ride along on the route, not driving, while a substitute drove the bus." (*Id*. at ¶ 69). Plaintiff, "an experienced and competent bus driver, was humiliated by being forced to ride as a passenger on a bus while another driver operated the bus." *(Id*. at ¶ 70). On March 26, 2021, Gallagher confirmed that Plaintiff "remained barred from driving a bus and told him to complete a new CDL application." (*Id*. at ¶ 71). On March 29, 2021, "Gallagher spoke with the DOT and learned that because the physician had not checked the box indicating an SPE was necessary, [Plaintiff] was cleared to drive." (*Id*. at ¶ 72).

"Gallagher relayed this information to Limbach, who continued to insist that the DOT requires an SPE because [Plaintiff] had cerebral palsy." (*Id*. at ¶ 73). On March 30, Limbach and Gallagher again met with Plaintiff, "resulting in Gallagher instructing [Plaintiff] to return to Concentra with Cheri Henrion of the local Durham School Services office and demanding that the physician indicate on the form that the SPE was required." (*Id*. at ¶ 74). Additionally, Durham informed Plaintiff that he would have to restart the SPE application process over, even though he had already submitted an entire application to the DOT. (*Id*. at ¶ 75).

Plaintiff alleges that Durham also provided Plaintiff with the application to complete and rejected Plaintiff's "medical report from Dr. Wild and demanded that he go to a different orthopedic surgeon for evaluation." (Compl. at ¶ 76 & 77). In May of 2021, Plaintiff made an appointment to see that physician, whose office was far from his home, received his "third medical examination in 2021 from Dr. Hyman" and presented it to Durham. (*Id*. at ¶ 79 & 80).

Plaintiff alleges that he then filed a grievance with his union and filed an EEOC charge

for unlawful discrimination.  Plaintiff alleges he was told that "Durham would only resolve his union grievance if he withdrew his EEOC charge." (Compl. at ¶ 81 & 82).  The union rejected that demand and the meeting ended with Plaintiff "being reinstated with seniority as a driver, except that [Plaintiff] would still need to submit another SPE application."  (*Id*. at ¶ 84).

In the meantime, Plaintiff "was still not allowed to operate a bus because of HireRight's directive that he required an SPE." (Compl. at ¶ 85).

On August 11, 2021, Durham informed Plaintiff that he "was required to undergo now a fourth medical examination, this time arranged by HireRight." (Compl. at ¶ 86).  On August 13, 2021, Plaintiff underwent a medical examination at a Concentra facility in Woodhaven, Michigan.  (*Id*. at ¶ 87).  Dr. Calder Conner performed that examination and, just like every other physician to examine Plaintiff since 2015, did not check off the box indicating that an SPE was necessary."  (*Id*. at ¶ 88).

On the long drive out to the Concentra clinic in Woodhaven, Plaintiff was frustrated and extremely distressed because of the blatantly unfair treatment he was experiencing.  (Compl. at ¶ 89).  Moreover, Plaintiff "has never considered his CP to constitute a disability or limitation in any way."  (*Id*. at ¶ 91).  "Being so exasperated by his employer's insistence on his undergoing an SPE and knowing that no other physician had ever found him to be disabled or impaired, [Plaintiff] did not check off the box on his Medical form indicating "19. Missing or limited use of arm, hand, finger, leg, foot, toe."  (*Id*. at ¶ 92).

Plaintiff "thought that since he has all his limbs and his CP does not limit his activities of daily living, and since the CP was causing such problems for his employment, he would not indicate the CP on his medical form and see whether that change would resolve the stressful, six

months of contention over his CDL renewal." (Compl. at ¶ 93).

"HireRight reviewed his form and highlighted for Durham the 'gotcha' moment it could use to justify terminating [Plaintiff's] employment—that he omitted the CP from his medical form." (Compl. at ¶ 94). Thereafter, Durham put Plaintiff on administrative leave supposedly because he had "falsified" his medical record. (*Id*. at ¶ 95). Durham later terminated Plaintiff's employment on September 15, 2021, "supposedly because he had 'falsified' his medical record." (*Id*. at ¶ 96).

"This reason for his termination is HireRight's incorrect, stereotyped view of [Plaintiff] as a person with a disability who should not be permitted to operate a bus, even though every examining physician determined that he was perfectly able pretext for the discriminatory animus Durham [ ] had demonstrated for six months by refusing to accept the fact that [Plaintiff] had no disability or impairment and was perfectly qualified to operate a school bus." (Compl. at ¶ 97). Plaintiff had listed his CP on every medical form prior to August of 2021, including the three prior medical examinations in 2021, and by August of 2021, and Durham had access to every one of these forms. (*Id*. at ¶ 98). "What's more, at no time prior to HireRight's screening in 2021 did [Plaintiff's] employer ever question his fitness to operate a school bus." (*Id*. at ¶ 99).

Plaintiff has subsequently found work as a school bus driver, first for another school system in Michigan and then in New Mexico, where he still works as a school bus driver; however, he earns far less than he did working for Durham. (Compl. at ¶ 100). In addition to significant economic losses, Plaintiff alleges that he "suffered emotional distress and extreme humiliation because of HireRight's unfair, stereotyped classification of him as a person with a disability." (*Id*. at ¶ 101).

11

## ANALYSIS

Defendant HireRight's Motion to Dismiss presents the following two issues: 1) "Whether HireRight is not a proper defendant under Michigan's civil rights laws?"; and 2) "Whether this Court should dismiss Count I because the medical examinations at issue were a necessary precondition for Hamilton's employment?"  (Def.'s Br. at v).

### I.      Has Plaintiff Pleaded A Viable Claim Against HireRight Under Michigan's PWDCRA?

At all relevant times, Plaintiff was employed as a school bus driver by Durham.  It is undisputed that HireRight has never employed Plaintiff.  Rather, HireRight is an entity that provides "employee screening services" to Durham.

The threshold issue presented in Defendant HireRight's motion is whether it can be held liable under Michigan's PWDCRA for disability discrimination against Plaintiff, a non-employee.  The parties agree that *McClements v. Ford Motor Co.*, 473 Mich. 373 (2005) controls this issue.  But they disagree as to its application to the facts alleged here.

Although Defendant HireRight never employed Plaintiff, it is undisputed that HireRight is an "employer" under the statute and that a non-employee can maintain a claim under the PWDCRA under certain circumstances.  *McClements, supra*; *Chiles v. Machine Shop, Inc*., 238 Mich.App. 462 (1999).

In *McClements*, the Michigan Supreme Court held that "an employer can be held liable" under the statute "for discriminatory acts against a nonemployee if the nonemployee can demonstrate that the employer affected or controlled a term, condition, or privilege of the nonemployee's employment."  *McClements, supra*, at 387.  "*McClements* thus focused on the element of control, not the label appended to the relationship."  *Cook v. Farm Bureau Life Ins.*

12

*Co. of Mich.*, 2019 WL 1460163 at *2 (Mich. App. 2019).  As explained in *McClements*:

> [L]iability under the PWDCRA "does not require that an employment relationship exist," but it does require that the employer defendant "have the authority to affect a plaintiff's employment or potential employment." *Id.* at 468–469, 606 N.W.2d 398. However, the authority to affect a worker's employment alone is not sufficient to impose liability upon an employer defendant. Rather, in order to be liable under the PWDCRA, the employer defendant must also "take[ ] adverse employment action" against the worker plaintiff. Accordingly, under *Chiles*, the employer defendant must (1) have "the ability to affect adversely the terms and conditions of an individual's employment or potential employment," *id.* at 468, 606 N.W.2d 398; and (2) "take[ ] adverse employment action against an 'individual' because of a handicap that is unrelated to the individual's ability to perform the duties of a particular job ..., e.g., discriminatorily refusing to hire an applicant on account of a disability," *id.* at 468, 606 N.W.2d 398, quoting M.C.L. § 37.1202(1)(a). In other words, the more precise articulation of the *Chiles* rule is that the employer defendant must, in fact, use such authority by "tak [ing] adverse employment action against an individual" in violation of the PWDCRA. Thus, to be liable under the PWDCRA, the employer defendant must actually affect or control a term, condition, or privilege of an individual's employment.

*McClements,* 472 Mich. at 388.

Defendant HireRight argues that Plaintiff cannot meet this test. It stresses that HireRight "did not directly or indirectly supervise" Plaintiff.  (Def.'s Br. at 11).  It further asserts that "HireRight did not adversely affect [Plaintiff's] employment because Plaintiff has not alleged that HireRight laid him off, fired him, disciplined him, nor controlled his job duties as a bus driver for Durham/National Express, such as when his shifts began and where he needed to pick-up and drop-off children."  (*Id.*).  Ignoring the actual language used in Plaintiff's Complaint (ie., that HireRight required, instructed, and directed Durham to take various actions), HireRight contends that "[a]t most, HireRight could make nonbinding recommendations that Durham/National Express would be free to follow or disregard as they saw fit."  (Def.'s Br. at 12).  There are no such allegations in the Complaint.

In response to the motion, Plaintiff argues that he has "adequately and plausibly alleged

13

that HireRight is an Employer and proper Defendant under the PWDCRA because it controlled

the terms and conditions of his employment as a bus driver." (Pl.'s Br. at 13). Plaintiff argues

that HireRight is plausibly liable because it had the ability to affect Plaintiff's employment,

explaining:

> First, as alleged, HireRight provides Durham, Plaintiff's employer, with
> "enhanced review" of driver's medical examinations and makes determinations
> about employees' job qualifications for Durham. Second, HireRight reviewed Mr.
> Hamilton's file and instructed Durham that he was "medically disqualified" and
> banned from driving a bus until he underwent an SPE. Third, even when Mr.
> Hamilton provided a second and third medical examination demonstrating that he
> did not need an SPE, HireRight nonetheless insisted on and arranged a fourth was
> acting as a liable agent for its own unlawful conduct separate from Durham—
> including but not limited to arranging and requiring the fourth medical
> examination in August of 2021 and classifying Plaintiff as "medical disqualified"
> from driving a bus based on its incorrect perception of his CP as a disability.
> Thus, Plaintiff has properly and sufficiently pleaded that Defendant
> HireRight is a proper Defendant in this lawsuit

(Pl.'s Br. at 15-16).

The facts presented in *McClements* are at one end of the spectrum. In that case,

Defendant Ford Motor Company hired AVI Food Systems to operate three cafeterias at one of its

assembly plants. The plaintiff was a cashier employed by AVI who worked in one of the

cafeterias. The plaintiff sought to assert a sexual harassment claim against Ford, based upon the

alleged actions of one of its employees, that occurred in the cafeterias. The trial court ruled that

the nonemployee plaintiff could not hold Ford liable under the statute. It held that "unless an

individual can establish a genuine issue of material fact that an employer affected or controlled a

term, condition, or privilege of his or her employment, a nonemployee may not bring a claim

under the CRA." *Id.* at 385. It found that, in the case before it, the plaintiff failed to establish

such control, explaining:

> In the instant case, plaintiff has failed to establish that defendant affected or controlled a term, condition, or privilege of her employment.  Plaintiff was hired, paid, and subject to discipline by AVI. AVI placed plaintiff in the Wixom plant and had the sole authority to move her to different cafeterias or even to another plant. Plaintiff has failed to demonstrate that defendant affected or controlled whether she was hired, her benefits of employment, or where she was assigned to work. Further, although the cafeterias were located in the Wixom plant, they were operated solely by AVI, and were off-limits to defendant's employees except during break-times.
>
> We conclude that plaintiff failed to raise a genuine issue of material fact that defendant affected or controlled a term, condition, or privilege of her employment. Accordingly, plaintiff may not maintain a cause of action under the CRA against this defendant . . .

*Id*. at 389-90.  Even under *those facts*, however, there was dissent as to whether the plaintiff could bring a CRA claim against Ford.  *Id.* at 396 ("Bennett was defendant's agent when he allegedly sexually harassed plaintiff.  Therefore, plaintiff can bring a claim against defendant for sexual harassment under the CRA.").

The facts presented in *Chiles* are at the other end of the spectrum (ie., where there clearly was sufficient control).  "In *Chiles*, an employee injured his back on the job and filed for worker's compensation benefits. After he was laid off, the employee brought suit under the PWDCRA. The 'employer,' who laid off the plaintiff, argued that it was not liable under the PWDCRA because the employee was technically employed by a separate, though affiliated, company." *McClements, supra*, at 387-88.   The facts included that while the plaintiff became technically classified as an employee of "Forestry Products, Inc." after a restructuring, that employee "actually worked for defendant, Machine Shop, Inc." *Chiles, supra*, at 402.  And, obviously, if the named employer was able to lay the plaintiff off, it controlled the terms and conditions of his employment.

In a very recent opinion, the Michigan Court of Appeals reversed a trial court's ruling

15

that a plaintiff could not bring a claim under the Elliott Larsen Civil Rights Act against the City

of Wayne because he was not an employee of the city.  *City of Wayne v. Miller*, Case No.

364138 (Mich. App. June 6, 2024 (ECF No. 12-1).   Rather, the plaintiff was employed as a

member of the city council.  The appellate court concluded that the plaintiff pleaded a viable

claim, under the rule set forth in *McClements*:

> Miller's pleadings, taken as true, establish a valid claim for employment discrimination under Article 2 of the ELCRA.  Although the City argued, and the trial court found, that Miller was not an "employee" of the City and that no "employment relationship existed, the plain language of the statute does not limit employment discrimination claims to employees. . . The Court in *McClements* [ ] held that a "worker is entitled to bring an action against a nonemployer defendant if the worker can establish that the defendant affected or controlled a term, condition, or privilege of the worker's employment."  *Id*. at 389.
>
> Applying *McClements* to this case, we conclude that irrespective of whether Miller, as an elected official, was an "employee" of the City, he certainly had employment and alleged that the City affected or controlled a condition of his employment.  Therefore, we conclude that Miller pleaded a viable claim under section 2 of the ELCRA.

(*Id.* at 5).

This Court finds that Plaintiff has pleaded a viable PWDCRA claim against Defendant

HireRight in this case.  There are few cases applying the rule set forth in *McClements* and

*Chiles*, and none of them include analogous facts as those alleged here.[1]  But based upon the

plain language of the rule, this Court concludes that Plaintiff has pleaded a viable claim against

HireRight, as he plausibly alleges that HireRight "affected or controlled a term, condition, or

---

[1]HireRight also directs the Court to an unpublished decision from the Michigan Court of Appeals, *Urbanski v. Sears Robuck & Company*, 2000 WL 33421411 (Mich. App. May 2, 2000).  That decision is not helpful as it addressed whether an individual supervisor could be held liable in her individual capacity.  And Plaintiff directs the Court to Judge Zatkoff's unpublished decision in *Esquivel v. Windsor Machine Stamping, Ltd.*, 2008 WL 11355058 (E.D. Mich. 2008) but that decision does not involve analogous facts either.

privilege" of his employment.

**II.    Should The Court Dismiss Count I Because The Medical Examinations At Issue Were A Necessary Precondition For Plaintiff's Employment?**

Count I of Plaintiff's Complaint is titled, "Discriminatory Medical Examination In

Violation Of The Persons With Disabilities Civil Rights Act, M.C.L. §§ 37.1101 Et Seq."  In this

count, Plaintiff alleges, in pertinent part:

104.    HireRight at all times acted as an agent of Durham [ ] and National Express by conducting employee screening and making determinations on their behalf that directly affected the terms and conditions of their employees; therefore, it is also covered under the PWDCRA.

105.    Mr. Hamilton is a qualified individual with a disability as defined in the PWDCRA, MCL 37.1103(d)(iii), because HireRight regarded him as someone with a disability even though he has no disability.

106.    The PWDCRA, MCL 37.1202(1)(d), prohibits medical examinations and inquiries into an individual's disability, "that are not directly related to the requirements of the specific job."

107.    HireRight conducted a superficial, incorrect and uninformed "screening" that Mr. Hamilton's CP—a condition that imposes no impairments or limitations on him—"medically disqualified" him from operating a school bus.

108.    Mr. Hamilton had operated buses for Durham [ ] for years without incident and passed his February 2021 medical screening; therefore, Durham [ ] had no job-related reason consistent with business necessity to believe that Mr. Hamilton required an SPE to be able to continue to work as a bus driver.

109.    The Federal Regulations governing the physical qualifications for commercial drivers do not require a driver, merely because he has CP, to undergo an SPE; rather, these regulations at 49 CFR 391.41 state that a driver is fit unless they have a condition that impairs or limits their ability to operate a vehicle safely.

110.    Mr. Hamilton has no condition that impairs or limits his ability to operate a motor vehicle safely.

111.    HireRight used this superficial and uninformed assessment to create a false basis to require Mr. Hamilton to go through three unnecessary medical examinations.

112.    There was no business necessity for Mr. Hamilton's three additional examinations imposed on him by Defendants in 2021 because his first examination in February 2021 was conducted by a physician at the Concentra clinic Defendant had directed him to go to for that examination.

113.   HireRight unlawfully discriminated against Mr. Hamilton because of an actual or perceived disability when it imposed on him these extra medical examinations that were redundant and therefore not job-related or a business necessity.

114.   HireRight unlawfully discriminated against Mr. Hamilton when it directed Durham to bar him from operating a school bus because it regarded him as a person with a disability.

115.   As a result of HireRight's unlawful acts, Mr. Hamilton has and will in the future experience economic and non-economic losses. His non-economic losses include emotional distress, embarrassment, loss of reputation, hurt feelings, mental anguish, sleep disturbances, a loss of self-confidence and an abiding sense of outrage about the behavior of the Employer's representatives responsible for this attack on his civil rights.

(Compl. at 15).

The PWDCRA prohibits employers from discriminating on the basis of physical or mental examinations that are not directly related to the requirements of the specific job at issue. Mich. Comp. Laws § 37.1202(1)(d).  Similarly, the ADA "prohibits an employer from 'requir[ing] a medical examination . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity."  *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014).

As its second challenge, HireRight asserts that Count I should be dismissed "because the medical examinations at issue were a necessary precondition" for Plaintiff's employment. (Def.'s Br. at v).   HireRight identifies the following as the controlling authority on this issue:

Most controlling or persuasive authority: *Prado v. Continental Air Transp. Co.*, 982 F. Supp. 1304, 1308 (N.D. Ill.1997) (holding that because the plaintiff lacked a medical certification, he was never qualified for the shuttle bus driver position); *Bay v. Cassens Transport Co.,* 212 F.3d 969, 974 (7th Cir.2000) ("Under applicable DOT regulations, [the defendant] was not allowed to permit [the plaintiff] to resume driving until he produced a copy of a doctor's certificate indicating he was physically qualified to drive, ... and nothing in the ADA purports to change that obligation").

(*Id.*).  The rulings in both of those cases, however, were summary judgment rulings – not

18

motion-to-dismiss rulings based on the pleadings.

The inquiry as to whether an employer has met its burden of proving a medical examination is job-related and consistent with business necessity is an issue that is typically addressed at the summary-judgment phase of a case.  *See, eg., Kroll, supra; Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007).

Here, HireRight's brief asserts that "compliance with DOT safety regulations are essential functions of a commercial driver."  (Pl.'s Br.).

Plaintiff does not disagree with that.  (*See* Pl.'s Br. at 18, noting that HireRight's brief "provides a page-long string of citations for the unremarkable principle that holders of commercial driver's licenses must undergo physical examinations.").  That is, Plaintiff agrees that he had to undergo "the necessary biannual physical exam required to maintain his CDL." (*Id*.).  What Plaintiff alleges is that HireRight discriminated against him, because it regarded Plaintiff as being disabled, and therefore required *more than* was required under the regulations and *more than* had ever been required of him during his tenure at Durham.  Plaintiff claims that HireRight did not require other drivers who presented their valid medical certifications to take an SPE in order to continue to operate a bus.  Because HireRight regarded Plaintiff as disabled, however, it instructed Durham to disregard a valid medical certification from a doctor and require Plaintiff "to undergo an SPE before he could be cleared to drive – a physical examination he did not need, according to every DOT medical examination he had taken."  (Pl.'s Br. at 19).

The Court rejects this challenge, especially given that it is made at this motion-to-dismiss phase of the case.

**III.    Should The Court Dismiss All Claims Against HireRight Because It Cannot Be The Proximate Cause Of Plaintiff's Damages?**

Although not included in the questions presented in its motion (*see* Def.'s Br. at v), the body of Defendant's motion also asserts that this Court should dismiss both claims against HireRight because it cannot be the proximate cause of Plaintiff's alleged damages.  (Def.'s Br. at 22).  HireRight asserts that it cannot be the proximate cause of Plaintiff's alleged damages because Plaintiff's own misconduct (by not checking a box related to his CP) and actions of others breaks the chain of causation as to HireRight.  In support of its position, HireRight directs the Court to *Henderson v. FedEx Express*, 442 F. App'x 502 (11th Cir. 2011) and *Kenney v. Aspen Techs.*, 965 F.3d 443, 450 (6th Cir. 2020).  Both of those decisions, however, were summary judgment rulings – not motion-to-dismiss rulings made based upon the pleadings.

In response, Plaintiff asserts that but-for HireRight's demand that Plaintiff take unnecessary physical examinations, he never would have been terminated.  Plaintiff directs the Court to *Merillat v. Michigan State Univ.*, 207 Mich App. 240 (1994).  He asserts that *Merillat* "instructs that the unlawful discriminatory act is the unnecessary examination itself; therefore, a Defendant who imposes this unlawful condition is liable for any harm flowing from that examination, irrespective of whether one 'failed' the examination or refused to submit to it." (Pl.'s Br. at 21).  Plaintiff contends that his "omitting his CP from his fourth medical examination form in August of 2021 is akin to the *Merillat* plaintiff's refusal to fill out the pre-examination questionnaire" and that he was "terminated but-for and because of HireRight's insistence on the unnecessary examination."  (*Id.*)

Given Defendant's reliance on summary judgment decisions, and the rather unique facts alleged here, and in light of *Merilatt* and considering that Plaintiff's requested damages include emotional distress damages, this Court concludes this is an issue that is better addressed in a

20

motion for summary judgment following discovery and denies this challenge without prejudice.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion to Dismiss is

DENIED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  June 28, 2024